229 P.3d 1036

**SAGUARO HIGHLANDS COMMUNITY ASSOCIATION, an Arizona non-profit corporation, Plaintiff/Appellee,**

v.

**Jack C. BILTIS and Leigh Biltis, husband and wife, Defendants/Appellants.**

**No. 1 CA–CV 09–0261.**

Court of Appeals of Arizona, Division 1, Department C.

May 6, 2010.

---

Carpenter, Hazlewood, Delgado & Wood, P.L.C. by Maura A. Abernethy and Mark A. Holmgren, Tempe, Attorneys for Plaintiff/Appellee.

Kutak Rock L.L.P. by Douglas H. Allsworth and Jennifer L. Kraham, Scottsdale, Attorneys for Defendants/Appellants.

## OPINION

BROWN, Judge.

¶ 1 Jack and Leigh Biltis ("Appellants") appeal from the superior court's denial of their motion to compel arbitration. For the following reasons, we affirm.

## BACKGROUND

¶ 2 Appellants' home is located in the community of Saguaro Highlands. Appellants installed a swing set in the backyard of their lot allegedly in violation of the Declaration of Covenants, Conditions and Restrictions ("CC & Rs") because they failed to obtain prior approval from the Saguaro Highlands Community Association ("the Association"). After sending several letters to Appellants requesting compliance with the CC & Rs, the Association filed a complaint in superior court seeking injunctive relief and alleging a breach of contract based on Appellants' violation of the CC & Rs.

¶ 3 Appellants filed a motion to compel arbitration. They argued that pursuant to the CC & Rs, "all matters are to first be submitted to negotiation, mediation and arbitration before filing a lawsuit." During oral argument, the superior court determined it would be beneficial to permit the parties to brief the issue of whether an arbitrator could issue an injunction under Arizona law. After consideration of the additional briefing, the court denied Appellants' motion, reasoning in part as follows:

Upon reflection and a complete review of the ... [CC & Rs], the court has concluded that the intent of the drafter was that Article 10 required arbitration of disputes between homeowners, their association and/or the association's board and the original declarant and developers as to the quality of construction of improvements and its compliance with building codes and good construction and development practices. The arbitration clause was not intended to apply to disputes between the association and individual homeowners concerning payment of fees and construction of improvements by homeowners which may violate the CC & Rs.

Article 9.1 grants the association the right to enforce the project documents in any manner provided by law or in equity, *including an action to obtain an injunction to compel removal of any improvements or to otherwise compel compliance with the project documents.*

...

Accordingly, notwithstanding the law's strong preference for arbitration, the CC & Rs do not require arbitration of disputes between the association and a homeowner for the removal of an improvement constructed by a homeowner[.]

¶ 4 Appellants timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101.01(A)(1) (2003).

## DISCUSSION

### I. Arbitration Clause

¶ 5 Arizona law has long favored arbitration as a way to "obtain an inexpensive and speedy final disposition of the matter involved." *New Pueblo Constructors, Inc. v. Lake Patagonia Recreation Ass'n,* 12 Ariz.App. 13, 16, 467 P.2d 88, 91 (1970). "[A]rbitration clauses should be construed liberally and any doubts as to whether or not the matter in question is subject to arbitration should be resolved in favor of arbitration." *Id.* (citations omitted); *see also* A.R.S. § 12–1501 (2003) ("[A] provision in a written contract to submit to arbitration any contro-

versy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract."). Notwithstanding this public policy, "an arbitrator cannot resolve issues which go beyond the scope of the submission agreement" and "[p]arties are only bound to arbitrate those issues which by clear language they have agreed to arbitrate." *Clarke v. ASARCO Inc.*, 123 Ariz. 587, 589, 601 P.2d 587, 589 (1979); *So. Cal. Edison Co. v. Peabody W. Coal Co.*, 194 Ariz. 47, 51, ¶ 11, 977 P.2d 769, 773 (1999) ("Although it is commonly said that the law favors arbitration, it is more accurate to say that the law favors arbitration of disputes that the parties have agreed to arbitrate.")

¶ 6 A deed containing a restrictive covenant that runs with the land is a contract, the interpretation of which is a matter of law. *See Powell v. Washburn*, 211 Ariz. 553, 554, 555, ¶ 8, 125 P.3d 373, 374, 375 (2006). "[T]he function of the law is to ascertain and give effect to the likely intentions and legitimate expectations of the parties" who create the covenants. *See id.* at 556–57, ¶ 13, 125 P.3d at 376–77 (noting that the Restatement (Third) of Property: Servitudes § 4.1(1) (2000) recommends that a "servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created"). Neither party asserts the existence of any disputed factual issues concerning the creation of the CC & Rs or the meaning of the language used in the document; therefore, our review is de novo. *Id.* at 556–57, ¶ 8, 125 P.3d at 375–76. Nor is there any dispute that the CC & Rs were created by the developer of Saguaro Highlands, referred to as the "declarant" in the document. Thus, the question before us is whether the declarant intended that the dispute at issue here—failure to obtain proper approval for a structure—falls within the alternative dispute resolution provisions contained in the CC & Rs.

¶ 7 Article 10 of the CC & Rs, entitled "Claim and Dispute Resolution/Legal Actions," includes the following preamble:

It is intended that the Common Area, Areas of Association Responsibility, each Lot, and all Improvements constructed ... will be constructed in compliance with all applicable building codes and ordinances and that all Improvements will be of a quality that is consistent with good construction and development practices in the area where the Project is located for production housing similar to that constructed within the Project. Nevertheless, due to the complex nature of construction and the subjectivity involved in evaluating such quality, disputes may arise as to whether a defect exists and the responsibility therefore. *It is intended that all disputes and claims regarding Alleged Defects[1] will be resolved amicably, without the necessity of time-consuming and costly litigation.* Accordingly, all Developers, the Association, the Board, and all Owners shall be bound by the following claim resolution procedures.

(Emphasis added.) Based on that language, Article 10 clearly requires use of alternative dispute resolution procedures for the resolution of construction defects. Section 10.4 of Article 10, however, points to a much broader possible interpretation of when these procedures should be applied. It reads as follows:

Any dispute or claim between or among (a) a Developer (or its brokers, agents, consultants, contractors, subcontractors, or employees) on the one hand, and any Owner(s) or the Association on the other hand; or (b) any Owner and another Owner; or (c) *the Association and any Owner regarding any controversy or claim between the parties, including any claim based on contract, tort, or statute, arising out of or relating to (i) the rights or duties of the parties under this Declaration; (ii) the*

---

1. Pursuant to Section 1.1 of the CC & Rs, "alleged defect" means "alleged defect(s) caused by the negligence of Developers, or their respective agents, consultants, contractors or subcontractors, in the planning, design, engineering, grading, construction, or other development of any portion of the Common Area, Areas of Association Responsibility, any Lot or Residence, and/or any Improvements constructed on the property."

design or construction of the Project; (iii) or an Alleged Defect, but excluding disputes relating to the payment of any type of Assessment (collectively a "Dispute"), shall be subject first to negotiation, then mediation, and then arbitration as set forth in this Section 10.4 prior to any party to the Dispute instituting litigation with regard to the Dispute.

(Emphasis added.) According to this section, "any claim" relating to the rights or duties of the parties under the CC & Rs must be subjected to negotiation, mediation, and arbitration before litigation may be commenced. Section 10.4 also creates an exception for one type of dispute—those involving payments of any Assessment, which suggests that all disputes not included in the exception are included in the scope of the section.

¶ 8 Section 9.1 of the CC & Rs relates to "enforcement" and provides as follows:

> The Association or any Owner shall have the right to enforce the Project Documents in any manner provided for in the Project Documents or by law or in equity, including, but not limited to, an action to obtain an injunction to compel removal of any Improvements constructed in violation of this Declaration or to otherwise compel compliance with the Project Documents. ... If any lawsuit is filed by the Association or any Owner to enforce the provisions of the Project Documents or in any other manner arising out of the Project Documents or the operations of the Association, the prevailing party in such action shall be entitled to recover from the other party all attorneys' fees, costs and expenses incurred by the prevailing party in addition to any relief or judgment ordered by the court in the action (including post-judgment attorneys' fees and costs).[2]

(Emphasis added.) According to this section, the Association has the right to enforce compliance with the CC & Rs. Undeniably, Section 9.1 and Section 10.4 present at least a potential conflict in the Declaration because of the broad language used in Section 10.4. If the literal language of Section 10.4 is followed, without considering the remainder

of the CC & Rs, then all disputes, except those involving Assessments, are subject to Article 10. As noted, however, our task is to give effect to the intentions and expectations of the declarant.

¶ 9 Appellants argue that the language of Section 10.4 is clear and must be applied to this dispute. Although Appellants concede that section 10.4 of the arbitration clause focuses largely on construction defect disputes, they argue nonetheless that the section is not limited to such disputes; otherwise the language referring to "any claims" is meaningless. The Association counters that article 10 of the CC & Rs applies only to construction defects.

¶ 10 Viewing the CC & Rs as a whole, we agree with the superior court's assessment that the plain meaning of the preamble of Article 10 indicates the declarant intended for all disputes involving construction defects to be handled through alternative dispute resolution procedures. There is no indication, however, other than the poorly drafted language of Section 10.4, that Article 10 was intended to apply to disputes between the Association and the lot owners regarding a structure placed on a lot by the lot owner in violation of the CC & Rs.

¶ 11 We find additional support for this conclusion in other provisions of the CC & Rs. First, Article 10 provides for mandatory negotiation, mediation, and arbitration, with specific timelines for compliance. We cannot agree that the declarant intended for disputes involving placement of structures on the lot to be subject to such requirements, particularly if the structure were being constructed in direct contravention of the CC & Rs. For example, if a lot owner decided to construct an impermissible building in blatant disregard of the CC & Rs, it would be unreasonable to expect that the Association would have to wait for the negotiation and mediation processes to occur before having any opportunity to arbitrate the matter. Even accepting Appellants' view that an arbitrator can order an injunction, the Association would still not be able to obtain any

---

**2.** "Project Documents" is defined in section 1.42 of the CC & Rs as "this Declaration, the Articles, the Bylaws, the Association Rules, the Architectural Rules, and the Plat."

order from the arbitrator until the first two steps were completed, which could take months.

¶ 12 Second, the language of Section 5.13 indicates that expenditure of funds for litigation expenses to initiate certain legal proceedings requires prior approval of the majority of the membership except for enforcement of use restrictions, association rules, architectural committee rules, or unpaid assessments. Stated differently, if the Association desires to initiate litigation to enforce the CC & Rs, then it does not need membership approval. If it intends to pursue other litigation, such as a construction defect claim, then the members would have to approve it. This approach is consistent with the declarant's apparent intent to treat CC & R violations differently than other types of disputes, such as construction defects.

¶ 13 Finally, we note a significant difference in the treatment of attorneys' fees. Under Section 9.1, the prevailing party in an enforcement action is entitled to recover attorneys' fees, costs and expenses incurred in the litigation. Section 10.4.3.8, however, provides that each party to a dispute shall bear all its own costs incurred prior to and during the arbitration proceedings, including all attorneys' fees, discovery costs and expenses of witnesses. Thus, the declarant intended to allocate the financial burden of litigation under Article 10 (alternative dispute procedures) much differently than under Section 9.1 (enforcement of CC & Rs), supporting the view that two different dispute resolution procedures were intended.

¶ 14 In sum, under a plain language reading of the CC & Rs as a whole, section 10.4 applies to disputes over alleged construction defects, as the preamble to article 10 indicates, and 9.1 applies to enforcement actions related to violations of the CC & Rs. There-

fore, the Association or any owner would have the authority to take action to obtain an injunction, under section 9.1, "to compel removal of any [i]mprovements constructed in violation of [the CC & Rs][.]" As did the superior court, we read sections 9.1 and 10.4 to represent distinct procedures for resolving disputes between the Association and individual homeowners concerning violations of the CC & Rs—construction of an improvement made by the homeowner, on the one hand, and construction defects by a developer or contractor, on the other. Because the dispute at issue in this case does not involve a construction defect, Article 10 of the CC & Rs is not applicable and the superior court did not err in denying the motion to compel arbitration.[3]

## II. Attorneys' Fees

¶ 15 Each party requests an award of attorneys' fees on appeal. Based on our determination that the superior court did not err in denying Appellants' motion to compel arbitration, Appellants have not prevailed on appeal and therefore are not entitled to fees. As for the Association's request, we decline to award fees at this time and defer the request to the trial court "pending resolution of the matter on the merits." *See Tierra Ranchos Homeowners Ass'n v. Kitchukov,* 216 Ariz. 195, 204, ¶ 37, 165 P.3d 173, 182 (App.2007).

## CONCLUSION

¶ 16 For the foregoing reasons, we affirm the superior court's denial of the Appellants' motion to compel arbitration.

CONCURRING: PATRICK IRVINE, Presiding Judge, and DONN KESSLER, Judge.

---

3. Based on our conclusion that the intent of the declarant was to provide for different procedures for resolving construction defect disputes, we need not address whether an arbitrator has authority to grant injunctive relief under Arizona law. Additionally, we reject Appellants' contention that any inconsistencies between sections 9.1 and 10.4 are resolved by reviewing sections 10.6 and 10.7 of the CC & Rs. Specifically, sec-

tion 10.7 instructs that "if there is a conflict between this Article and any other provisions of the Project Documents, this Article shall control." In construing Article 10 to apply only to the resolution of claims or disputes involving "alleged defects," we find no conflict between Article 10 and Section 9.1. Similarly, Section 10.6, which refers to post-arbitration proceedings, does not support Appellants' position.